NOVI v ROBERT ADELL CHILDREN'S FUNDED TRUST

Docket No. 223944. Submitted May 14, 2002, at Detroit. Decided October 4, 2002, at 9:10 A.M. Leave to appeal sought.

The city of Novi brought an action in the Oakland Circuit Court against the Robert Adell Children's Funded Trust, the Franklin Adell Children's Funded Trust, the Marvin Adell Children's Funded Trust, and Novi Expo Center, Inc., seeking, pursuant to the Michigan Home Rule City Act, MCL 117.1 *et seq.*, and the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.*, condemnation of real property owned by the Adell trusts to enable the city to construct a public road. With their answer to the complaint, the Adell trusts filed a motion challenging the city's assertion that the purpose and the necessity of the proposed taking were public in nature and satisfied the requirements of Const 1963, art 10, § 2. The Adell trusts argued that the road would primarily serve the private interests of Wisne Corporation by providing it with access to Grand River Avenue once it loses its current access as a result of a bridge improvement project. The court, Jessica R. Cooper, J., agreed with the Adell trusts and dismissed the action. The city appealed.

The Court of Appeals *held*:

Const 1963, art 10, § 2 does not permit a public agency to take private property for a private purpose. An exception exists for instrumentalities of commerce. Cases in which the exception properly applies have three characteristics: first, public necessity of the extreme sort; second, continuing accountability to the public; and third, selection of land according to facts of independent public significance.

While the proposed road project in this case has the first and second characteristics, it does not have the third. The decision to condemn the Adell trusts' property was made almost entirely with reference to the private interests of Wisne Corporation. The proposed road project does not fall within the instrumentalities of commerce exception.

Affirmed.

EMINENT DOMAIN — INSTRUMENTALITIES OF COMMERCE.

A public agency may not take private property for a private purpose; an exception exists for instrumentalities of commerce, which are

characterized by public necessity of the extreme sort, continuing accountability to the public, and selection of land according to facts of independent public significance (Const 1963, art 10, § 2).

*Secrest, Wardle, Lynch, Hampton, Truex and Morley* (by *Thomas R. Schultz*) for the city of Novi.

*Steinhardt Pesick & Cohen, P.C.* (by *H. Adam Cohen*), for Adell Children's Funded Trusts.

Before: WHITBECK, C.J., and O'CONNELL and METER, JJ.

WHITBECK, C.J. Plaintiff city of Novi appeals as of right from the trial court's order dismissing its condemnation action after the trial court determined that the proposed taking of certain property owned by the Robert Adell Children's Funded Trust, the Franklin Adell Children's Funded Trust, and the Marvin Adell Children's Funded Trust (the Adell trusts) primarily benefited a private interest, not the public. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

It is apparently undisputed that the city of Novi has long experienced traffic congestion at the intersection of Grand River Avenue and Novi Road. According to the trial court, the city proposed to construct two roads to deal with this situation. The first was to be the "Ring Road" or "Crescent Boulevard," that would form a ring around the congested intersection. The second was to be A.E. Wisne Drive that was to serve as an "industrial spur" and that would traverse the Adell trusts' property.

As part of this road project, the city commenced a condemnation action pursuant to the Michigan Home

Rule City Act[1] and the Uniform Condemnation Procedures Act,[2] principally to acquire property for the A.E. Wisne Drive. The Novi Expo Center sits on the Adell trusts' property, which they rent to the Novi Expo Center, Inc. When the Adell trusts filed their answer to the complaint, they also filed a motion that, according to the trial court, challenged both the public purpose and the necessity of the condemnation as it related to the A.E. Wisne Drive. The Novi Expo Center did not join in the motion. The Adell trusts argued that the city abused its discretion and committed clear legal error as well as fraud in seeking to condemn the property for the benefit of two private property owners, Wisne Corporation[3] and General Filters, Inc. The Adell trusts also contended that the city lacked the proper enabling legislation to support the condemnation action.

In July 1999, the trial court conducted an evidentiary hearing on the Adell trusts' challenge to the public purpose and necessity of the condemnation, taking testimony from twelve witnesses. At the close of defendants' proofs, the city moved to dismiss the Adell trusts' claim that it was constructing the road "for a private purpose and not for a public purpose." The trial court delayed ruling on the motion until it heard further proofs.

When the trial court ultimately issued its opinion and order on November 17, 1999, it articulated the critical issue as "whether [the city's] actions constitute a taking of private property for private use and,

---

[1] MCL 117.1 *et seq.*

[2] MCL 213.51 *et seq.*

[3] The Wisne Corporation, which is also known as Progressive Tool & Industries Company, Novi Industries, or PICO, owns nearby land. Lawrence Wisne is Wisne's president.

therefore, violates [sic] the takings clause of the Michigan Constitution, Const 1963, art 10, § 2." The trial court then stated the applicable legal standard, starting with the relevant statute:

> "With respect to an acquisition by a public agency, the determination of public necessity by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion." MCL 213.56(2); MSA 8.265(6)(2). Upon challenging such a determination, the property owner bears the burden of proof to show a lack of public necessity by fraud, error of law or abuse of discretion. *Detroit v Lucas*, 180 Mich App 47, 54; 446 NW2d 596 (1989), *lv den* 434 Mich 918 (1990). See *Kent County Rd Comm'n v Hunting*, 170 Mich App 222, 229-30; 428 NW2d 353 (1988), *lv den* 432 Mich 914 (1989).

The trial court ultimately found that defendants had "met their burden of showing that Plaintiff City's actions evidence a lack of public necessity by fraud, error of law and/or abuse of discretion." The trial court stated that "[a]pplying heightened scrutiny to the overwhelming evidence before this Court, the Court finds that the proposed industrial spur, A.E. Wisne Drive, is primarily for the benefit of Wisne, which benefit predominates over those to the general public." As a result, the trial court concluded that the proposed condemnation violated Const 1963, art 10, § 2.

## II. STANDARD OF REVIEW

Although this court reviews de novo statutory and constitutional issues,[4] we give "considerable weight"

---

[4] See *Attorney General v Michigan Public Service Comm*, 249 Mich App 424, 434; 642 NW2d 691 (2002).

to the trial court's factual findings.[5] A trial court's findings of fact may not be set aside unless clearly erroneous.[6] "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed."[7]

### III. THE CITY'S APPEAL

In its brief on appeal, the city maintains that the proper public purpose of this desired construction project is to minimize a public hazard for individuals traveling on Grand River Avenue when traffic flows from the Wisne/PICO and General Filters facilities on a single, shared access to the public road. The city contends that, because A.E. Wisne Drive would be a public road and would aid traffic congestion problems in the area, there is concrete proof that the condemnation was primarily for the public's benefit. Thus, the city claims that the proposed taking was constitutional.

While the ultimate constitutional issue remained a central focus at oral arguments, counsel for the city and the Adell trusts also attempted to elucidate the difference between, on the one hand, the public purpose/public use of land being condemned and, on the other hand, the public necessity of the condemnation. The fog of terminology in the statutes and the opinions interpreting these statutes did not make the attorneys' task any easier. Thus, after first reviewing

---

[5] *Bell River Associates v China Charter Twp*, 223 Mich App 124, 129; 565 NW2d 695 (1997).

[6] MCR 2.613(C).

[7] *Meek v Dep't of Transportation*, 240 Mich App 105, 115; 610 NW2d 250 (2000).

the law of takings, but before we consider whether the trial court correctly held that this was an unconstitutional taking, we examine the burden on a property owner with respect to challenging the public use of property that is the subject of a condemnation proceeding.[8]

### IV. TAKINGS OVERVIEW

The federal and state constitutions permit government takings of private property only with just compensation.[9] However, regardless of compensation, the government may not take private property for a private purpose.[10] In *Poletown Neighborhood Council v Detroit*,[11] the Michigan Supreme Court stated that "whether the proposed condemnation is for the primary benefit of the public or the private user" determines if the taking is constitutional. As the *Poletown* Court explained:

> The power of eminent domain is restricted to furthering public uses and purposes and is not to be exercised without *substantial proof* that the public is primarily to be benefited. Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with *heightened scrutiny* the claim that the public interest is the predominant interest being advanced. Such public benefit cannot be speculative or

---

[8] See, generally, *Paschke v Retool Industries (On Rehearing)*, 198 Mich App 702, 705; 499 NW2d 453 (1993), rev'd on other grounds 445 Mich 502; 519 NW2d 441 (1994) ("The court is *obligated* only to review issues that are properly raised and preserved; the court is *empowered*, however, to go beyond the issues raised and address any issue that, in the court's opinion, justice requires be considered and resolved." [Emphasis in original.]).

[9] US Const, Am V; Const 1963, art 10, § 2.

[10] *Tolksdorf v Griffith*, 464 Mich 1, 8; 626 NW2d 163 (2001).

[11] *Poletown Neighborhood Council v Detroit*, 410 Mich 616, 632; 304 NW2d 455 (1981).

marginal but must be *clear and significant* if it is to be within the legitimate purpose as stated by the Legislature.[12]

## V. THE ADELL TRUSTS' BURDEN

The city sought to condemn the Adell trusts' property pursuant to the process prescribed in the Uniform Condemnation Procedures Act (UCPA).[13] The UCPA is just that, a procedural statute. It does not grant the power of eminent domain to a city. Rather, the UCPA "provides standards for the acquisition of property by an agency, the conduct of condemnation actions, and the determination of just compensation."[14] In setting procedures, however, the UCPA appears to draw at least something of a distinction between public purpose/public use and public necessity:

> (1) Within the time prescribed to responsively plead after service of a complaint, an owner of the property desiring to challenge the *necessity* of acquisition of all or part of the property for the *purposes* stated in the complaint may file a motion in the pending action asking that the *necessity* be reviewed. The hearing shall be held within 30 days after the filing of the motion.
>
> (2) With respect to an acquisition by a public agency, the determination of public *necessity* by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion.

---

[12] *Id.* at 634-635 (emphasis supplied).

[13] MCL 213.51 *et seq.*

[14] MCL 213.52(1); *Lansing v Edward Rose Realty, Inc,* 442 Mich 626, 632; 502 NW2d 638 (1993).

(3) [W]ith respect to an acquisition by a private agency, the court at the hearing shall determine the public *necessity* of the acquisition of the particular parcel.[15]

Thus, the statute, in subsection 1 appears to allow a challenge both to the necessity for the acquisition *and* to the purposes stated in the complaint. Further, in subsection 2, the statute seems to make the determination of public necessity binding on the reviewing court, in the absence of a showing of fraud, error of law, or abuse of discretion. At the same time, subsection 2 is entirely silent on what effect, if any, the public agency's determination regarding public use/public purpose might have on the reviewing court. In other words, the UCPA does not place a burden on the property owner to disprove the agency's assertion that the taking serves a public purpose/public use, implicitly suggesting that the agency must positively demonstrate the public purpose/public use. This burden is consonant with the language in Const 1963, art 10, § 2.

Nevertheless, this Court in its dicta in *Detroit v Lucas*[16] essentially combined the separate concepts of public purpose/public use and public necessity as they are used in the UCPA. In *Lucas*, the city of Detroit, pursuant to the downtown development authority act,[17] filed eight condemnation cases.[18] Five of the property owners unsuccessfully challenged the city's claim that the condemnation was necessary, citing the UCPA.[19] Though the *Lucas* panel actually

---

[15] MCL 213.56 (emphasis supplied).

[16] *Detroit v Lucas*, 180 Mich App 47; 446 NW2d 596 (1989).

[17] MCL 125.1651 *et seq.*

[18] *Lucas, supra* at 49.

[19] *Id.*

rejected the appeal on a jurisdictional basis,[20] it also indicated that it would have concluded that there was no merit in the property owners' argument that public use and public necessity were separate inquiries and that the city of Detroit bore the burden of proving that the condemnation satisfied both inquiries.[21] In the view of the *Lucas* panel, property owners "bear the burden of proof of showing a lack of public necessity, either by fraud, error of law, or abuse of discretion."[22] In contrast, "[n]o other separate statute under the UCPA provides for a *separate determination of public use.*"[23] As the *Lucas* panel put it, "the clear wording of the [UCPA] . . . specifies the burden of proof regarding the determination of *'public necessity.'* "[24]

To the extent that this language addresses only public necessity, it is both unexceptional and correct. Earlier in its opinion, however, the *Lucas* panel stated:

> [T]he Lucases contend that the trial court improperly shifted to them the burden of proving that the property to be taken is for a public use, *asserting that both the fact that the taking is for a public use and the necessity of the taking are essentially separate inquiries and that the* UCPA standard of review for necessity does not apply to the public use prong. *However, this claim is without merit.*[25]

---

[20] *Id.* at 51.

[21] *Id.* at 52-53.

[22] *Id.* at 53.

[23] *Id.* (emphasis supplied).

[24] *Id.* (emphasis in original).

[25] *Id.* at 52 (emphasis supplied).

In our view, this dicta in *Lucas* rejecting a separate inquiry for public purpose/public use was erroneous.[26] The language of the UCPA regards the inquiries concerning public purpose/public use, on the one hand, and necessity, on the other hand, as separate, imposing a burden on the property owners to show fraud, error of law, or abuse of discretion only with respect to the *necessity* prong of the inquiry. Case law provides support for a conceptual difference between public purpose/public use and public necessity. In *Pere Marquette R Co v United States Gypsum Co*,[27] for example, the Court interpreted a condemnation statute and commented that

> [t]he use mentioned in the statute must be a public use, and the necessity a public necessity. The resolution of the board of directors in New York City made no reference to public use or public necessity, but only to the expediency and necessity of developing its own business. There is nothing in any of the proofs offered by the petitioner to indicate a public use. The only allegation in the petition upon this point is "that the taking of the lands and property above particularly described is necessary for the public use." It is repugnant to common sense and justice that the mere allegation that one's land is necessarily required for the public use by a corporation is sufficient to cast upon him the burden of showing why it should not be taken, and to show those facts, many of which are peculiarly within the knowledge of the petitioner. The statute provides for framing an issue. When the allegations are admitted, or, as held by some authorities, not denied, proof of the facts alleged is not essential; but, where the answer expressly traverses

---

[26] Because *Lucas* was decided before November 1, 1990, we are not bound to follow the rule of law established in that case. See MCR 7.215(I)(1).

[27] *Pere Marquette R Co v United States Gypsum Co*, 154 Mich 290; 117 NW 733 (1908).

them, the effect of the statute simply is to put the petitioner to its proofs. This is nearly the universal holding of the courts.[28]

Further, the majority in *Poletown* extensively considered the public purpose/public use question without ever suggesting that the property owners in that case were required to show fraud, error of law, or abuse of discretion. If the inquiry regarding public purpose/public use, on the one hand, and the inquiry regarding necessity, on the other hand, are in fact only one inquiry, then, logically, the property owners in *Poletown*—and, indeed, in all cases in which there is a challenge to both public purpose/public use *and* to necessity—would have such a burden.

Therefore, if and to the extent that the trial court in this case conflated public purpose/public use with public necessity, it erred in the same fashion as did the *Lucas* panel in its dicta. Such error, if it occurred, was entirely harmless. The trial court concluded that, even under the extremely restrictive UCPA burden-shifting provision regarding necessity, A.E. Wisne Drive was primarily for the benefit of the Wisne Corporation and that this "benefit predominates over those to the general public." If the trial court applied the burden-shifting provision of the UCPA regarding necessity to the question of public purpose/public use, we do not agree that this was appropriate. However, as we explain below, we do agree with the trial court that the private benefit the Wisne Corporation would have acquired if the city condemned the Adell trusts' property for A.E. Wisne Drive predominated

---

[28] *Id.* at 297-298.

over any benefit to the general public from this condemnation.

### VI. THE FOG OF TERMINOLOGY: PUBLIC PURPOSE VERSUS PUBLIC USE

In *Poletown*, the city of Detroit had proposed, pursuant to the Economic Development Corporations Act,[29] condemning a large tract of land, which it would then convey to General Motors Corporation as a site for the corporation's new assembly plant. The key issue in the trial court was whether, under the UCPA, the city abused its discretion "in determining that condemnation of plaintiffs' property was necessary to complete the project."[30] The trial court dismissed the plaintiffs' complaint.[31] The Supreme Court immediately took the appeal and articulated the issue being appealed only in terms of whether the taking was unconstitutional because it was for "private use."[32] Nevertheless, in discussing whether the intended use for the land, if condemned, would be public or private, the Court mentioned necessity:

> In the court below, the plaintiffs-appellants challenged the *necessity* for the taking of the land for the proposed project. In this regard the city presented substantial evidence of the severe economic conditions facing the residents of the city and state, the need for new industrial development to revitalize local industries, the economic boost the proposed project would provide, and the lack of other adequate available sites to implement the project.

---

[29] MCL 125.1601 *et seq.*

[30] *Poletown, supra* at 628.

[31] *Id.*

[32] *Id.* at 628-629.

As Justice COOLEY stated over a hundred years ago "the most important consideration in the case of eminent domain is the *necessity* of accomplishing some public good which is otherwise impracticable, and . . . the law does not so much regard the means as the need." *People ex rel Detroit & Howell R Co v Salem Twp Board*, 20 Mich 452, 480-481 (1870).

When there is such public need, "[t]he abstract right [of an individual] to make use of his own property in his own way is compelled to yield to the general comfort and protection of community, and to a proper regard to relative rights in others." *Id.*[33]

Justice RYAN, somewhat famously, dissented in *Poletown*.[34] In his view,[35] the majority opinion had failed to distinguish between the terms public "purpose" and public "use" when it stated that the terms "have been used interchangeably in Michigan statutes and decisions in an effort to describe the protean concept of public benefit."[36] In contrast, Justice RYAN believed that, as used in Michigan, the term "public purpose" related to taxation while the term "public use" related to condemnation. Justice RYAN saw this as a substantive distinction, commenting that,

[a]s a general proposition then, in the realm of aid to private corporations, "public purpose" (taxation) has been construed less restrictively than "public use" (eminent domain). The distinction is fully justified. The character of governmental interference with the individual in the case of taxation is wholly different from the case of eminent

---

[33] *Id.* at 633-634 (emphasis supplied).

[34] Indeed, one panel of this Court has indicated its disagreement with the majority opinion in *Poletown* and stated its preference for Justice RYAN's dissenting view. See *Detroit v Vavro*, 177 Mich App 682; 442 NW2d 730 (1989).

[35] *Poletown, supra* at 669.

[36] *Id.* at 629-630.

domain. The degree of compelled deprivation of property is manifestly less intrusive in the former case: it is one thing to disagree with the purposes for which one's tax money is spent; it is quite another to be compelled to give up one's land and be required, as in this case, to leave what may well be a lifelong home and community.[37]

Despite the persuasive value of Justice RYAN's dissent, the majority's decision in *Poletown* is binding.[38] Under that decision, there is no difference between the terms "public purpose" and "public use"; the terms are interchangeable. Thus, we use the somewhat awkward, but accurately descriptive, term "public purpose/public use" through the remainder of this opinion. Clearly, however, both the majority and the dissent in *Poletown* regarded public purpose/public use, on the one hand, and public necessity, on the other, as being separate concepts with separate inquiries.

### VII. INSTRUMENTALITY OF COMMERCE EXCEPTION

Even though we are not at liberty to adopt the distinction between public purpose and public use that Justice RYAN articulated so well in his dissent in *Poletown*, he did discuss another point that we find relevant to the core constitutional issue in this appeal. In *Poletown*, Justice RYAN frankly admitted that the law did not wholly ban condemning property so that it could be transferred to private corporations, citing the "instrumentality of commerce exception."[39]

---

[37] *Poletown, supra* at 666.

[38] See *Felsner v McDonald Rent-a-Car, Inc*, 193 Mich App 565, 569; 484 NW2d 408 (1992).

[39] *Poletown, supra* at 671-672.

This exception permitted condemnation for the "establishment or improvement of avenues of commerce—highways, railroads, and canals, for example—and can be traced to the common law where it was considered an exception to the general rule[.]"[40] After examining cases involving this exception, Justice RYAN concluded that

> three common elements appear in those decisions that go far toward explicating and justifying the use of eminent domain for private corporations: 1) *public* necessity of the extreme sort, 2) continuing accountability to the *public*, and 3) selection of land according to facts of independent *public* significance.[41]

According to Justice RYAN, in a case in which the sole and fundamental challenge to the taking was whether there was a public *use* to support the proposed taking, public *necessity* was a relevant factor. We find this distinction to be helpful in this case.

VIII. PUBLIC PURPOSE/PUBLIC USE VERSUS PRIVATE INTERESTS

Here, our review indicates that the record supports the trial court's determination that, when applying heightened scrutiny to the review of the project, A.E. Wisne Drive primarily benefited Wisne/PICO, even if it provided tangential benefits to the public. The evidence demonstrated that a scheduled Oakland County Road Commission project would cut off Wisne/PICO's driveway onto Grand River Avenue. If this were to be done, Wisne/PICO would have no public road access to its property, although it had an easement over the

---

[40] *Id.* at 670-671, citing *Salem, supra* at 479.
[41] *Poletown, supra* at 674-675 (emphasis in original).

Novi Expo Center property to reach its facilities. Therefore, if the city did not complete the Ring Road, Wisne/PICO would have to build a new driveway connecting to Grand River Avenue.

The city contacted Wisne/PICO in the early 1990s, seeking private funding for A.E. Wisne Drive, which would run from the Ring Road onto the Wisne/PICO property. Wisne/PICO committed $200,000 to the project. In 1995, the city's manager asked Wisne/PICO for an additional $174,000, in exchange for which the city would declare the drive a public street and accept all maintenance responsibilities. Although Wisne/PICO ultimately did not give the city the extra money, the city proceeded toward developing A.E. Wisne Drive as a public road.

Juliet Rowley, a civil engineer involved with the project, testified that the purpose of A.E. Wisne Drive was to give better access to Grand River Avenue from Wisne/PICO and General Filters. According to Rowley, if A.E. Wisne Drive were not built, the Oakland County Road Commission would have to investigate another location as an alternative access for Wisne/PICO and General Filters. Although the road commission could condemn property owned by Wisne/PICO or General Filters for access onto Grand River, such an action could add months to the construction of the Grand River bridge.

There was also evidence, which defendants stipulated, that the current exit from the Wisne/PICO property onto Grand River Avenue created a hazardous situation for Grand River traffic. However, the Oakland County Road Commission planned to eliminate this access road as part of the Grand River Bridge Improvement Project. The evidence indicated that the

county had not planned an alternative access because it was relying on the city's taking of the Adell trusts' property to create A.E. Wisne Drive. The Wisne/PICO property would not be landlocked after the county bridge project eliminated the current access road to Grand River Avenue because Wisne/PICO had an easement to its property over the Novi Expo Center property. While the Ring Road was important to eliminate traffic congestion, it could be built without taking the Adell trusts' property to create A.E. Wisne Drive. A.E. Wisne Drive, as the name indicates, would primarily benefit the Wisne/PICO property. Neither the city nor the county had seriously considered alternative access routes to the Wisne/PICO property other than taking the Adell Trusts' property for A.E. Wisne Drive.

The city argues, however, that the condemnation of private property by a public authority for roads and bridges is a public purpose, *irrespective of* whether a road will benefit private interests or benefit one individual more than others. For the former proposition, it cites *Detroit Int'l Bridge Co v American Seed Co*[42] and *Allen v Rogers.*[43] For the latter proposition, it cites the treatise Nichols on Eminent Domain (3d ed) and *Fields v Iosco Twp Hwy Comm'r.*[44] We agree with the Adell trusts that *Allen* does not stand for the proposition that condemnation for roads is automatically for a public purpose. There were two holdings in *Allen.* The first was that the statute[45] authorizing the State Highway Commissioner to condemn property

---

[42] *Detroit Int'l Bridge Co v American Seed Co*, 249 Mich 289, 295; 228 NW 791 (1930).

[43] *Allen v Rogers*, 246 Mich 501; 224 NW 632 (1929).

[44] *Fields v Iosco Twp Hwy Comm'r*, 102 Mich 449; 60 NW 1048 (1894).

[45] 1925 PA 352 as amended by 1927 PA 92.

for road purposes required the State Highway Com-
missioner to make a *bone fide* effort to secure the
lands by purchase as a condition precedent to the
right to institute condemnation proceedings.[46] The
second was that the State Highway Commissioner
was lawfully empowered to acquire by condemnation
lands within the corporate limits of the city of
Detroit.[47] The case goes no further and we find noth-
ing in *Allen* that supports the city's position.

*American Seed* is more on point. There, the plain-
tiff was organized for the purpose of constructing,
owning, and operating a "highway bridge" across the
Detroit River. Under the pertinent condemnation stat-
ute,[48] a corporation organized for constructing, own-
ing, or operating any highway bridge across a river
forming a part of a boundary between Michigan and
any other state or country had the "power to con-
demn any and all real estate, or interest therein, or
pertaining thereto deemed necessary for the purposes
of such corporation."[49] The defendant claimed that
the 1925 and 1927 amendments of the corporation
code, granting this right of eminent domain, were
unconstitutional.[50] The Court disagreed, observing
that a highway was a public way,[51] that a toll road or
bridge, if established by public authority, is a high-
way, and that land may be taken for it under the

---

[46] *Allen, supra* at 503, 506-507.

[47] *Id.* at 510.

[48] 1921 PA 84 as amended by 1925 PA 232 and 1927 PA 335.

[49] *American Seed Co, supra* at 294.

[50] *Id.* at 295.

[51] *Id.*

power of eminent domain.[52] The Court went on to hold that

> [t]he taking of property "deemed necessary for the purposes of such corporation," as provided in the statute, plainly has reference back to the public purpose of "constructing, owning or operating any highway bridge." *Swan v Williams*, 2 Mich 427 [1852].[53]

*American Seed* dealt not with a public entity exercising the right of condemnation but, rather, with a private entity that was a member of a class of corporations that had been given the right of condemnation by statute. That statute, *by its own terms*, contained a finding of necessity "for the purposes of such corporation" and, according to the Court, a finding that constructing, owning, or operating a highway bridge was for a public purpose.[54] Here, the city was proceeding under the Home Rule City Act,[55] which authorizes a home rule city to acquire property "for any public use or purpose within the scope of its powers, whether herein specifically mentioned or not."[56] The Home Rule City Act does not, *by its own terms*, contain either a finding of necessity or of public purpose.

The Court in *American Seed* cited *Swan*, which also dealt with a situation in which a private entity that, by the act of its incorporation[57] and by several statutes, was authorized to appropriate private property for the purposes contemplated within the act, in

---

[52] *Id.*

[53] *Id.* at 296.

[54] *Id.* at 294.

[55] MCL 117.1 *et seq.*

[56] MCL 117.4e(2).

[57] Passed by the Territorial Legislature in March 1834. See *Swan, supra* at 430.

this instance the running of railroad cars of the Detroit and Pontiac Railroad Company over the plaintiff's property.[58] The plaintiff contended that this provision of the act of incorporation violated the Northwest Ordinance, which governed the Michigan Territory in the period predating the 1835 Constitution,[59] and the United States Constitution, because the property would not be taken for "public use."[60] The Court rejected this contention and engaged in an extended discussion of the circumstances under which a corporation could be empowered to exercise the power of eminent domain. While, to be sure, the Court in *Swan* analogized a railroad line to "turnpikes and common highways,"[61] we do not view that case as standing for the proposition that constructing a railroad, street, or highway is always for a public purpose. Indeed, in commenting on the class of corporations that it labeled "public" corporations because they acted as trustees or agents of the government,[62] the Court stated:

> In the creation of this class of corporations, public duties and public interests are involved, and the discharge of those duties, and the attainment of those interests, are the primary objects to be worked out through the powers delegated to them. To secure these, the right of pre-eminent sovereignty is exercised by the condemnation of lands to their use—*a right which can never be exercised for private purposes.*[63]

---

[58] *Swan, supra* at 428, 429.

[59] See *People v Antkoviak*, 242 Mich App 424, 443; 619 NW2d 18 (2000).

[60] *Swan, supra* at 434.

[61] *Id* at 437.

[62] *Id.* at 435.

[63] *Id.* at 435-436 (emphasis supplied).

Finally, neither Nichols nor *Fields* fully supports the city's position. Indeed, Nichols states, "Town or township roads, as well as city streets, are clearly for a public use even if there is an incidental private benefit or if one individual will benefit more than others."[64] This language strongly implies that, if the private benefits *predominate*, rather than merely being incidental, then a city street is *not* for public use. *Fields* echoes the sentiment that a highway or street is not automatically a public use for land the government takes. In *Fields*, the highway commissioner sought to "lay out and establish" a highway in August of 1893 after a petition by the "requisite number of freeholders."[65] Fields sought to enjoin the commissioner from opening the highway or from taking his property. The commissioner's answer asserted that he had found the highway necessary, that it was a public highway and not a private way or road, and that there were no false representations to him.[66] The Court commented:

> This answer must be taken as true,—that the laying out of the highway was a public necessity, and that no false representations were made in procuring it to be laid out. It is admitted by counsel for complainant that, under certain circumstances, a *cul de sac* might be considered a public highway; but it is said that no such circumstances exist here, as it is for the private use of Walters and Munsell only. The answer denies this, and asserts that it is a public necessity, and the commissioner has so found in his order. There is no statute or rule of law that expressly determines that,

---

[64] 2A Nichols, Eminent Domain (3d ed), § 7.06(4)(a), p 7-121.

[65] *Fields, supra* at 450-451.

[66] *Id.* at 452-454.

before a public highway can be laid out, it must have certain and definite *termini* in other public highways.[67]

At best, this appears to have been a procedural decision, within the context of the rules of pleading as they existed at that time, to accept the commissioner's answer as both accurate and determinative. Rather clearly, the situation in *Fields* is not overly similar to the facts of this case.

In a broader sense, however, these older cases bolster Justice RYAN's contention in his *Poletown* dissent that an "instrumentality of commerce" exception exists that militates against a narrow application of the concept of public use with respect to such instrumentalities.[68] The first characteristic that Justice RYAN mentioned was "public necessity of the extreme sort."[69] He commented:

> With regard to highways, railroads, canals, and other instrumentalities of commerce, it takes little imagination to recognize that without eminent domain these essential improvements, all of which require particular configurations—narrow and generally straight ribbons of land— would be "otherwise impracticable"; they would not exist at all. "A railway cannot run around unreasonable landowners." *Ryerson v Brown* [35 Mich 333, 339 (1877)]. *Cf. Ellis v Grand Rapid*, 257 F Supp 564, 568-569 (WD Mich, 1966).[70]

---

[67] *Id.* at 454.

[68] We recognize that Justice RYAN's comments were within the context of a case in which a public entity was condemning private property for the use *and ownership* of a private corporation and that is not the fact pattern in the case before us; A.E. Wisne Drive will be publicly owned. Nevertheless, Justice RYAN's analysis is helpful in this situation as well.

[69] *Poletown, supra* at 674.

[70] *Id.* at 675-676.

This reasoning is perfectly applicable to the Ring Road in this case. We see almost no applicability to A.E. Wisne Drive. The purpose of this spur is, primarily, to benefit the Wisne/PICO property. It is, in our view of the record, not an essential improvement that requires a particular configuration. The fact that, without eminent domain, it would not exist at all does not change its essential character.

The second characteristic that Justice RYAN mentioned was continuing accountability to the public.[71] He amplified by stating that "it is clear that public control of the use of land after transfer to the private entity invests the taking with far greater public attributes than would exist without the control and fortifies the justification for the abridgement of individual property rights in those cases."[72] Here the city would retain control of A.E. Wisne Drive. Standing alone, this factor would bolster the contention that the spur is an instrumentality of commerce.

The third factor that Justice RYAN mentioned was selection of land according to facts of independent public significance.[73] He amplified on this point, stating that "determination of the specific land to be condemned is made without reference to the private interests of the corporation. The determination is based instead upon criteria related to the public interest."[74] In our view, it is on this characteristic that A.E. Wisne Drive fails entirely. The record convinces us that the decision to condemn the Adell trusts' property was made almost entirely with reference to the

[71] *Id.* at 674.

[72] *Id.* at 679.

[73] *Id.* at 674-675.

[74] *Id.* at 680.

private interests of Wisne/PICO. We conclude, therefore, that A.E. Wisne Drive does not fall into the instrumentality of commerce exception that Justice RYAN described in his *Poletown* dissent. The fact that the spur is a public street does not, automatically and standing alone, mean that it is for a public purpose/public use.

Our conclusion in this regard is bolstered by cases following the *Poletown* decision. In *City of Center Line v Chmelko*,[75] the city instituted condemnation proceedings in an attempt to acquire two parcels of property and, pursuant to the UCPA, the property owners challenged the necessity for the taking.[76] The trial court found that the taking was for a private purpose, and this Court affirmed, stating:

> The condemnation of private property for other than a public use is not sanctioned by the constitution. It is well-established that the power of eminent domain may not be exercised where the intention to confer a private use or benefit forms the purpose or a part of the purpose for the taking. *Shizas v Detroit*, 333 Mich 44, 59-60; 52 NW2d 589 (1952).[77]

This Court used a similar approach in its decision in *Lansing v Edward Rose Realty, Inc (Rose I)*.[78] In *Rose I*, pursuant to a city ordinance, the city of Lansing passed resolutions condemning easements on the property of Edward Rose Realty for the purpose of providing Continental Cablevision service to residents

---

[75] *City of Center Line v Chmelko*, 164 Mich App 251; 416 NW2d 401 (1987).

[76] *Id.* at 253.

[77] *Id.* at 258-259.

[78] *Lansing v Edward Rose Realty, Inc*, 192 Mich App 551; 481 NW2d 795 (1992).

of Edward Rose Realty's apartment complexes. Edward Rose Realty challenged the condemnation on the basis of public necessity and the trial court found that the city ordinance served a public interest and upheld the condemnation as valid.[79] This Court reversed. After analyzing *Poletown* in some detail, the *Rose I* panel concluded:

> Finally, under the second prong of the *Poletown* heightened scrutiny test, we must decide whether the private or public benefit predominates. Under the circumstances of this case, we conclude that the primary beneficiary of the taking is not the public, but rather Continental Cablevision. The condemnation permits Continental Cablevision to use the easements not merely to provide PEG [public, education, and government] programming to interested tenants of defendants' apartment complexes, but also to sell to hundreds of residents its full range of basic and premium services essentially duplicative of defendants' SMATV [satellite master antenna television] programming. The public benefit flowing from this action is marginal at best and must be deemed secondary to the commercial benefits flowing to Continental Cablevision.[80]

In *Lansing v Edward Rose Realty* (*Rose II*),[81] the Supreme Court affirmed, reasoning:

> Although we assume the validity of the public interest advanced by the City, we find that the private interest to be benefited predominates over the asserted public interest. The asserted public interest therefore does not justify the proposed taking of private property by the city.[82]

\*     \*     \*

---

[79] *Id.* at 554.

[80] *Id.* at 557-558.

[81] *Lansing v Edward Rose Realty, Inc*, 442 Mich 626; 502 NW2d 638 (1993).

[82] *Id.* at 635.

> Hence, where a proposed government action confers a benefit on a private interest, unless that benefit is merely incidental, a reviewing court will inspect with heightened scrutiny the assertion by the governmental entity of a public purpose.[83]

Here, the record convinces us that the purpose, or part of the purpose, of the taking was to confer a private use or benefit on Wisne/PICO. The primary beneficiary of the taking is not the public, but rather Wisne/PICO. Although we assume the validity of the public interest advanced by the city, we find that the private interest to be benefited predominates over the asserted public interest. The asserted public interest therefore does not justify the proposed taking of private property by the city. The taking was thus unconstitutional.

Our conclusion in this regard is heightened by the language by which the majority in *Poletown* limited its decision. The majority stated:

> Our determination that this project falls within the public purpose, as stated by the Legislature does not mean that every condemnation proposed by an economic development corporation will meet with similar acceptance because it may provide some jobs or add to the industrial or commercial base. *If the public benefit was not so clear and significant, we would hesitate to sanction approval of such a project. The power of eminent domain is restricted to furthering public uses and purposes and is not to be exercised without substantial proof that the public is primarily to be benefited. Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominate interest being advanced. Such public benefit cannot be specula-*

---

[83] *Id.* at 639.

*tive or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by Legislature.*[84]

Here, the City has not demonstrated that the public is primarily to be benefited from the construction of A.E. Wisne Drive. Rather, the spur benefits specific and identifiable private interests, those of Wisne/PICO. The trial court correctly applied heightened scrutiny and we agree with its analysis. The public benefit here is not clear and significant; rather, it is speculative and marginal. The fact that A.E. Wisne Drive is to be a public road does not, standing alone, automatically mean that the public purpose/public use would be advanced by its construction.

Affirmed.

---

[84] *Poletown, supra* at 634-635 (emphasis supplied).